IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS (DALLAS)

| | |
|---|---|
| IN RE: | Case No. 26-32580-MVL-11 |
| MCITBE LLC, | Chapter 11 |
| Debtor. | |
| | Wednesday, October 15, 2026 |
| | 1:38 P.M. |

PARTIAL TRANSCRIPT OF HEARING ON
MOTION TO DISMISS CASE FILED BY U.S. TRUSTEE (113)
TESTIMONY OF ALI CHOUDHRI AND BENCH RULING

**BEFORE THE HONORABLE MICHELLE V. LARSON**
**UNITED STATES BANKRUPTCY COURT JUDGE**

APPEARANCES:

For the Debtor:

Yablon Law PLLC
BY: MARK P. YABLON, ESQUIRE
2777 Allen Parkway, Suite Floor 10
Houston, Texas 77019

Vincent Law, PLLC
BY: COURTNEY ANN VINCENT, ESQUIRE
1035 Dairy Ashford, Suite 145
Houston, Texas 77079

Audio Recorder: Bryon A. Robinson
Earle Cabell Federal Building
1100 Commerce Street, Room 1254
Dallas, Texas 75242

Transcription Service: Liberty Transcripts
9107 Topridge Drive
Austin, Texas 78750
(847) 848-4907
DBPATEL1180@GMAIL.COM

Proceedings recorded by electronic sound recording; transcript produced by transcription service.



Exhibit B

APPEARANCES:

For Interested Party, Travis B. Vargo, Court-Appointed Receiver:

Luttrell Carmody Law Group
BY: LESLIE M. LUTTRELL, ESQUIRE
100 NE Loop 510
San Antonio, Texas 78216

For the United States Trustee:

Office of the United States Trustee
BY: MEREDYTH KIPPES, ESQUIRE
1100 Commerce Stret, Room 976
Dallas, Texas 75242

For Creditor Shahnaz Choudhri:

Shackleford, McKinley & Norton LLP
BY: LORI A. HOOD, ESQUIRE
717 Texas Avenue, 27th Floor
Houston, Texas 77002

INDEX

PAGE

MATTERS HEARD:

MOTION TO DISMISS CASE FILED BY U.S. TRUSTEE (113)

**Court's Ruling - Granted** **37**

WITNESSES FOR THE DEBTOR:

ALI CHOUDHRI
Direct Examination by Ms. Vincent 5
Examination by the Court 6
Cross-Examination by Ms. Kippes 35

EXHIBITS: Marked Admitted

EXHIBITS FOR THE DEBTOR:

(None)

(The following transcript contains a portion of the proceeding held on this day, pursuant to request of ordering party.)

(Testimony of Ali Choudhri began at 3:13 p.m.)

MS. VINCENT: In addition to that, I did want to ask the Court if there were any questions that you wanted to ask of the Debtor first before we move forward because I know that Trustee Kippes presented a lot of information that raises a lot of questions.

THE COURT: Oh, I have lots and lots of questions. So whenever you're ready to call your witness, I have lots of questions.

MS. VINCENT: Okay, Your Honor. Well, then I would like to go ahead and call Mr. Choudhri as my first witness.

THE COURT: On behalf of the Debtor?

MS. VINCENT: On behalf of the Debtor.

THE COURT: All right. Mr. Choudhri, if you could say "testing, testing" so you appear on the screen.

MR. CHOUDHRI: Testing, testing.

THE COURT: Thank you very much. If you could raise your right hand for me.

ALI CHOUDHRI, DEBTOR'S WITNESS, SWORN

THE COURT: Thank you very much.

Please proceed, Ms. Vincent.

MS. VINCENT: Thank you, Your Honor.

DIRECT EXAMINATION

BY MS. VINCENT:

Q The first question I would like to ask you, Mr. Choudhri, is if you can clarify for the Court exactly what your role is in MCITBE, because there were some questions that were raised this afternoon.

A Sure. So I am a director of MCITBE. I hold no ownership, and I've never held any ownership of MCITBE LLC.

Q All right. Thank you. Is there any -- because you are a director of MCITBE, is there anything that you would also like to add or proffer this afternoon?

A Yes. I had planned on making an opening, but I didn't get an opportunity, but I do -- I guess I could proffer some of the things here because of my knowledge that --

MS. KIPPES: Your Honor?

THE COURT: Yes.

MS. KIPPES: Objection to --

THE COURT: Calls for narrative?

MS. KIPPES: -- narrative testimony. Counsel can ask Mr. Choudhri what she wants to ask Mr. Choudhri, and he can respond, but I object to narrative.

THE COURT: Sustained.

MS. VINCENT: Thank you, Your Honor.

Okay. Therefore, as a result that in this particular format that the Trustee objects to, then I will go ahead and

pass the witness.

THE COURT: All right. And so if I am correct, is this the witness you're putting up on behalf of the Debtor?

MS. VINCENT: Yes, Your Honor.

THE COURT: Okay. Well, then on behalf of the Debtor, this is your Debtor's rep.

MS. VINCENT: Oh, and also Paul Cox.

THE COURT: Okay.

MS. VINCENT: He is also one of our witnesses.

THE COURT: Because I have questions for the Debtor. So I will either ask them of Mr. Choudhri, if that is your witness for the Debtor, or I will ask them of whoever you put up.

MS. VINCENT: I would prefer that my witness be Mr. Choudhri on behalf of the Debtor.

THE COURT: Okay.

MS. VINCENT: Because he is the director of MCITBE.

EXAMINATION

BY THE COURT:

Q So, Mr. Choudhri, I understand, again, that you're the director of the Debtor. So explain to me your role in preparation of the Debtor's Schedules and Statements.

A I mean, outside of -- I -- I -- I did not -- that is something Mr. Cox and Mr. Yablon handled. I was asked questions, lots of questions, which I answered. I provided

information, like closing statements and documents I have from Jetall/Croix and the closing from MCITBE in 2023.

Obviously, I'm, you know, a manager and continue to be a manager of Jetall/Croix, the borrower. And so I have a lot of intimate information with the history of, you know, the sale of the property from MCITBE, which is owned by my mother, to Jetall/Croix, and the seller financing and the collateral assignment.

And then, you know, I have knowledge of -- that the loan matured one year later. I obviously also was involved with Security State Bank. I sourced Security State Bank for -- on behalf of the borrower. And again, borrower in this case, Your Honor, is Jetall/Croix, not to be confused with the Debtor MCITBE. And I have knowledge of who Mr. Doug Zimmerer is. I know his name has been brought up.

Q Okay. Who is Mr. Doug Zimmerer?

A Yes, Your Honor. So Mr. Zimmerer is -- he is an investor. He represents some trust that are some wealthy families. And he's an investor and he invests in various opportunities and deals. He represents some groups that have acquired loans and things of that sort and had interest in buying the note and lien in this case.

And in fact, I believe, Your Honor, it's one of the exhibits that I think was presented before where Mr. Zimmerer had contacted Security State Bank, I believe, approximately 10

months ago in March or April to acquire the note and lien. And Mr. Zimmerer is aware that, you know, the issues with the cloud of title and how those issues have really chilled. It's -- it's -- it's affected the Debtor in getting even counsel. I believe there was a, you know, a Vickie Driver and a few other local counsel that Mr. Yablon spoke to.

Until the issue of who's in control of the Debtor was decided, it's really created a chilling effect. Also, the broker.

Q Who's in control of the Debtor? Wouldn't that be your mother and Mr. Cox who's in control of the Debtor?

A Yes. Yes, Your Honor. The -- MCITBE -- Mr. Vargo is not in control of the Debtor, but he represents to everyone he is. And he's also made filings in public records on the property that he is in control of MCITBE and the property.

Q Why would Mr. Zimmerer be paying Mr. Yablon's retainer?

A Mr. Zimmerer is an invest -- you know, he is an investor and has provided funding --

Q An investor in what? I understand he is an investor, okay.

A Yes.

Q Why would that investor, the human, be paying the retainer of counsel for the Debtor?

A Your Honor, I'm aware that Mr. Zimmerer has -- has provided funding to opportunities that he sees that are -- that

are feasible. And he wants -- he -- he had interest. And in fact, that's -- that's -- I had personal knowledge of Mr. Zimmerer investing in different opportunities because he has capital to invest. And he was interested in buying the note and was interested in buying the note in this property.

Q Do you not know the answer, Mr. Choudhri, or are you declining to answer my question? Either is fine.

A No, Your Honor. I'm not declining --

Q I just need to get to bottom.

A No, Your Honor, I'm not declining any questions, Your Honor. And I'll --

Q So you don't know why he would be paying Mr. Yablon's retainer?

A I'm not sure if he paid Mr. Yablon's retainer. I'm aware that he has provided funding.

Q All right, just give me one moment.

A And he was interested in hiring a lawyer for the DIP lending. But then when I believe they looked at it, they needed to get the receivership issue resolved first because it was going to be very costly before that. And that was a difficult matter.

Q All right. I am going to quote to you from Mr. Yablon's application at Docket 221. Paragraph 31 indicates, "The Debtor paid counsel a $2,000 initial retainer prepetition about June 8th, 2026 through Douglas Zimmerer."

A Okay.
Q Why would Douglas Zimmerer pay the bankruptcy counsel's retainer?
A He's -- he's an investor, Your Honor. He would like to see not just --
Q He's an investor in MCITBE?
A No, he's an independent investor who acquires opportunities and is --
Q So he saw an opportunity to pay a bankruptcy lawyer's fee? How does one profit on that?
A Well, I don't know about profiting, Your Honor. I do -- I'm aware, and I believe Mr. Zimmerer could also answer these questions, but I'm aware that he has provided capital and provided contributions on different matters based on the circumstance of what he's seen.

There is another opportunity that he found where a property was being foreclosed and he offered to buy the loan. Similar in this situation, he offered to buy the loan. There were claims in another case where he offered to buy the -- he's bought claims. And so the quagmire here has been not just this entity, but many entities have been commandeered, so to say, by -- by Mr. Vargo. And he has a personal -- he has an interest in making some money by buying into these -- buying into these opportunities or buying loans.

And -- and -- and I can tell Your Honor that, you know, I

have made it clear to him that, you know, it's -- it's a difficult situation. And, you know, and he's indicated that he's interested in -- in -- in helping out with the situation. And there are lots of people that have offered to help in the situation that -- that not just this -- you know, not just this entity and this Debtor are in but other situations where Mr. Vargo has and Ms. Beth Mendez, who's on the call, who's an assistant of Osama, has clouded title, specifically in this case, and then offered Security State Bank to sell the note to them.

Q Okay. And so in Paragraph 32 of Docket 221, Mr. Yablon as an officer of the Court states that the Debtor paid -- oh, excuse me. It says, "Yablon Law paid the Subchapter V Trustee, Behrooz Vida, $1,000 for the Debtor's first monthly payment to the Trustee by Check Number 1007 drawn on Yablon Law's operating account."

Why would the lawyer be paying the Subchapter V Trustee rather than the Debtor?

A Well, I don't believe the Debtor may have funds to pay it is what I believe. And I believe Mr. Zimmerer is interested in seeing the Debtor be -- you know, the matter be successful and so the property is not lost because he's interested in -- because I think there's an opportunity for him from what he's expressed to me that he thinks this is --

Q Okay, so the next sentence says, "On July 24th, 2026,

Yablon Law emailed the Debtor Invoice Number 1897 for that $1,000. The Debtor paid that invoice through deposits that Douglas Zimmerer made into Yablon Law's operating account $10 and $490 on July 24th, 2026 and $500 on July 27th, 2026. And counsel requested the Debtor to directly pay Vida thereafter."

Okay, so once again, why is Mr. Zimmerer paying the lawyer for MCITBE?

A Your Honor, outside of what I've already represented to you that he -- he is a -- wants to see the property not lost and sees an opportunity in acquiring the debt.

Q Is Mr. Zimmerer an investor in any --

MR. YABLON: Your Honor?

Q -- of your other companies?

MR. YABLON: Your Honor, may I answer the questions --

THE COURT: No.

MR. YABLON: -- since I'm being mentioned.

THE COURT: You may not. We're in the middle of testimony, sir.

BY THE COURT:

Q All right. So, Mr. Choudhri?

A Yes. Yes, Your Honor.

Q Is Mr. Zimmerer, is he an investor of any in any of your other businesses?

A Outside of he has come to another court to buy a claim

that was being sold with one of his investors and he has made another offer and was prepared to wire money to buy another loan, no, Your Honor. Outside of -- you know, outside of opportunities he's seen and I believe in his mind, it has not been a significant amount of investment. This is pursuit costs for him that could materialize into something that could be profitable for him. That's my assessment.

Q To your knowledge, does he have any relationship with your mother outside of MCITBE? Has he invested in any of her other entities?

A No, Your Honor. I'm not aware that he has. He knows my mom and they have a good relationship.

Q Okay.

A And he's been very -- I can tell you he's been extremely sympathetic with the situation and says he's never seen anything like it in his entire life. He's also an attorney. He's also a CPA. And, you know, I think he's a very good human being and he has been very sympathetic with the situation. There's a lot of people that want to help and have been sympathetic. And at the same time, they are interested, you know, self-interested as well in an opportunity.

Q Okay. Does he have any relationship with Mr. Paul Cox?

A I -- I believe they're friends and I believe they -- they know each other. That's the extent of my information that I have.

Q Okay.
A I don't know anything else, Your Honor, outside of I believe if I recall that Mr. Zimmerer is a big Eric Clapton fan and he plays the guitar. And I believe Mr. Cox and Mr. Zimmerer may have some common friends and common things in that space.
Q Okay.
MS. VINCENT: That's exactly my understanding as well, Your Honor.
BY THE COURT:
Q So is it your testimony, Mr. Choudhri, or is it your understanding that Mr. Cox brought Mr. Zimmerer into this, I'll call it investment in the loosest terms possible?
A No, Your Honor.
Q No, you did?
A No, no, no, Your Honor.
Q So Mr. Zimmerer --
A Can I explain?
Q Just, I mean he didn't pop in from the cosmos. How did he come upon this again, what I will loosely call investment?
A So Mr. Zimmerer is aware of this situation with Mr. Vargo, and he seemed like there's a property that's worth --
Q Is he aware of it from reading it in the newspaper? Is he aware of it because you brought it to his attention? Is he aware of it because he and your mother play mahjong? Is he

aware of it because he was at a jam session with Mr. Cox and it just came up during a Layla recitation? I need to get some facts here.

A Yes, Your Honor. Let me give you full background if it would help Your Honor.

Q Please.

A I can give you the -- yes, Your Honor.

So I -- I'm involved in a lot of real estate. My mom has investments and -- and she's been, you know, obviously pulled into this and it's affected her. Mr. Vargo has, you know, frozen not just my accounts, but my mom's. And -- and -- and I met Mr. Zimmerer through his brother who is -- was on the Court of Appeals as a -- as a justice.

And Mr. Zimmerer gave -- you know, gave me some good recommendations on some of his investors that may be interested in acquiring -- because, you know, Your Honor, I can tell you that, you know, there is another example that he saw firsthand where there is a building worth $30 million and the debt's like 10. And Mr. Osama Abdullatif slanders the title, clouds title, and then gets Mr. Vargo to do the same. And then he goes buys it on -- as a discount. It's been a pattern, not just once, like happened so many times.

And Mr. Zimmerer thought that was quite unbelievable. And if there was an opportunity where he could bring investors in and buy these loans and do a workout, right, with me and my mom

and whatever other various entities. And -- and -- and candidly, you know, many of these bankruptcies are caused by Mr. Vargo and people that have gone along with believing in that he is somehow in control of these LLCs and my mom's companies.

Q So how many bankruptcies are going on right now, Mr. Choudhri? I mean, frankly, each time that we interact, I understand that you're in a different court.

A Yes, Your Honor.

Q How many bankruptcies are going on right now, sir?

A Let me explain, Your Honor. So -- so if you look at that -- list that I think is ECF 20, there's a list of entities on there. Some of them I have never had any ownership in. Some of them I have, like, partial ownership in.

But Mr. Vargo's position is that even though there's an except to LLC and, you know, charging order or whatnot, there's no order that gives him any of those rights. So there is an entity called Meandering Bend --

Q Okay, well, I'm clearly asking unclear questions, and I apologize for that. To frame the question, I'm looking for a number between 1 and 200.

A Okay.

Q How many bankruptcies are going on right now involving properties that you or your mother have an interest in?

A Your Honor, this would be -- this is one of them, right,

Your Honor? And there's another one called Arabella PH 3201 LLC.

Q Okay.

A And then there's 1001 WL, where Mr. Vargo has stipulated in state court to a $42-million judgment against me individually, which I don't know how he can do that.

MS. LUTTRELL: Your Honor, I'm going to have -- I'm sorry. For the purposes of the record, I just need to object to the narrative basis and the hearsay and the misrepresentations to the Court.

BY THE COURT:

Q Okay, I'm just looking for a number, and I'm --

A So, yes, Your Honor. So there's --

Q That's three.

A Rick -- some of them are not existing anymore, Your Honor. I'm not sure if you want the ones that are existing or not existing, but there's --

Q Okay, let's do this. I'm trying to bring some order to it. Is it more than 10?

MS. VINCENT: No, Your Honor.

THE WITNESS: No, Your Honor.

BY THE COURT:

Q Okay. Are you in personal bankruptcy?

A Your Honor, yes. I had filed personal bankruptcy on December the 5th, 2025. I did file a notice with your Court of

a notice of violation of the stay, which is what the foundation of this other order in the Western District. Ms. Luttrell told -- after my personal bankruptcy, Ms. Luttrell's position was only my non-exempt assets are part of the stay, the exempt ones are not.

So they did some self-help, and they got a $42-million -- first of all, the judgment is only for a couple of million dollars and I can't get a payoff --

Q Are you in bankruptcy in the Southern District or the Western District?

A Southern District. But Your Honor, I wanted --

Q The Southern District?

A Yes, that --

Q Is it Judge Norman, Judge Rodriguez?

A Judge -- Judge Lopez, Your Honor.

Q Judge Lopez, okay.

A There is a document that -- I'd point to Your Honor there is a document that I think is --

MS. VINCENT: Judge Perez. Does this also include the adversary, Your Honor?

THE COURT: (Indiscernible).

MS. VINCENT: Oh, okay.

A -- 217. I believe I filed at ECF 217, Your Honor, and it's got the bankruptcy case number.

Q Okay. All right, in front of Judge Christopher Lopez?

Okay.
A Yes, Your Honor. And that -- that -- that case is not open right now.
Q Oh, okay.
A It is -- yes, Your Honor. But I did file that and --
Q Did you receive a discharge?
A No, Your Honor. The case was dismissed without prejudice.
Q Okay.
A And Ms. Luttrell, Mr. Vargo's position is that all these LLCs are not, during the bankruptcy, were not part of the stay, so they went to Judge Robinson and told him that they're in control of Meandering Bend LLC when there's no order, just like they tried to do, I believe, with you on MCITBE. And they did it while the bankruptcy stay was in effect, so that's why I filed recently a motion to --
Q Right. And, again, we're not --
A Yes, Your Honor.
Q I'm trying to get --
A Sorry.
Q -- get covered what we actually have set today.
So the next assertion in Mr. Yablon's amended fee application at Docket 221 is at Paragraph 33. And that says that, "Maliha Mian sent $400 by Zelle to Yablon Law's operating account to cover travel expenses. Who is Maliha Mian?
A So she is an attorney who is a friend of mine. And

Mr. Yablon, I was actually visiting with her, and Mr. Yablon said that it would be really nice if he -- you know, he would be arrested if he stayed in a hotel or something along those lines. And she has not -- there's no loan, there's no -- she just said, hey, if you want me to help you out, if you need some help, I'll -- you know, I will --I will make a Zelle payment, and she did so.

Q So she paid $400 --

A Yes, Your Honor.

Q -- to the lawyer for MCITBE outside of a fee application?

A Yes, Your Honor.

Q Okay. And did you pay her back?

A No, Your Honor. It's not a debt. She says you don't have to pay it back. When your -- you know, when your mom is doing better than you guys --

Q So a friend of the director of the Debtor decided to, just out of pure generosity, pay $400 for travel expenses?

A Yes, Your Honor. That is 100 percent true and accurate.

Q With no expectation of being paid back by anyone?

A Absolutely not, Your Honor. And you're free to --

Q And so it's your testimony that no one paid her back?

A No, Your Honor. I'm -- I'm --

Q Okay.

A I can get her on the Zoom right now, and you can ask her yourself, Your Honor.

Q No, she's not on the witness list. That's fine.
All right, let's see.
A And, Your Honor, I do want to clarify one thing, Your Honor. None of any of this has ever been any burden or liability or debt incurred by the Debtor in any way, shape, or form. There's no --
Q Oh no, the burden so far has been on the Court. No, I understand where the burden has lied. The burden has lied on the United States Trustee, and the burden has been lain upon the Court, frankly, to have to deal with this.
I understood, Mr. Choudhri, that there was a broker that had been used by the Debtor since the petition date. Is that correct?
A Yes, Your Honor.
Q Okay. And so there was a broker that was being used early on in the case, and there was never an application to employ that broker, correct?
A Right. Yes, Your Honor. There was supposed to be an application, and I can't explain why it wasn't filed timely, candidly speaking. And I believe Ms. Vincent did provide them a declaration and documents to review, and they went and hired a law firm. And they reviewed, and their apprehension was that does the Debtor have authorization to sign the listing agreement, and so they backed out. And then there was another broker, Walzel, and they have agreed to do it.

Q Thank you for that, Mr. Choudhri. You've answered my question as whether or not there was a broker --
A Sorry, Your Honor.
Q -- because that was my understanding.
Is there any operations going on for the Debtor at this time?
A Outside of, Your Honor, the receivables, and, you know, being in, you know, trying to get this property -- you know, getting the Debtor reorganized and getting the cloud of title resolved, no -- no -- no, outside of -- you know, outside of that, outside of I guess Mr. Cox as an employee, outside of that, no, Your Honor. It's -- it's --
Q Was it your idea, Mr. Choudhri, to file this bankruptcy?
A No, Your Honor. It was not my idea.
Q And whose idea was that?
A Mr. Yablon was consulted with my mom and with Ms. --
Q So lawyers don't tend to come up with the need to file a bankruptcy. That is typically that of the debtor or the client. So who was the client representative that sought out bankruptcy representation?
A So Mr. Cox and my mom and Mr. Yablon discussed options that I'm aware of, because I was part of a meeting, actually a couple of meetings, to discuss what to do with the -- how -- how -- because the property cannot be sold with the cloud that's on the title.

Q So it's your testimony that the original reach-out for counsel and the original idea to file bankruptcy was either your mother or Mr. Cox's?
A Yes, Your Honor, for this Debtor. Yes, Your Honor. For this Debtor, that is correct.
Q And when meeting with Mr. Yablon, are you involved in those meetings?
A I have been.
Q Or does Mr. Yablon speak directly to your mother?
A He speaks directly to my mom.
Q Okay.
A He's spoken directly to my mom.
Q But are you there when he speaks with her?
A No, Your Honor. I'm not in every -- she -- her health is -- she's a very smart woman. She's been in business. And I can tell Your Honor that recently since September 15th, specifically when Mr. Vargo walked in her room while she was asleep, she is not -- she's already been very stressed out with the situation of her daughter. My sister has also been sued by Mr. Vargo. So she has asked me to help her more.
And Ms. Hood has been representing my mom. And there's a lot of people like including Ms. Hood who -- you know, and others who have really rolled up their sleeves to help because they don't believe that the situation is -- is appropriate --
Q What is --

A -- or fair.
Q Where does the Debtor operate out of, Mr. Choudhri?
A 4521 San Felipe. It had an office, but Mr. Vargo has taken over that office. It was 1000 --
Q Okay, and what was the office?
A This was, I think, about a year ago, 1001 West Loop.
Q Okay, now I'm trying to find out, I'm more interested in the time period between the petition date and today. So the petition date was June 10th, 2026. And so currently the address says 4521 San Felipe in Houston. And so my question for you is, what other address has this Debtor operated out of since June 10th of this year?
A 11511 Gallant Ridge. It maintained its files and documents there. And then they were moved over. And my mom now has been in the last several weeks to 4521 San Felipe.
Q Okay, so what is --
A There was an office before, but that -- if -- Judge, if I can explain, give you a little background if you want to hear it, but if not, I don't want to --
Q I'm just, again, I'm just trying to understand the three changes of address on the petition date alone. Okay, I want to --
A Yes, Your Honor.
Q I'll just go back to the docket just for ease of reference. Okay, so this case was filed, and it says the

principal place of business is 2232 Swift Boulevard in Houston in Harris County. Okay. So how did the case get to the Northern District of Texas in Dallas?

A Your Honor, Mr. Yablon suggested that because he has some -- some affiliation and MCITBE does and has in the past done some business and opportunities, but Mr. Yablon suggested that the Debtor could file anywhere in Texas. And that was something Mr. Yablon decided.

Q So Counsel selected the Northern District as a venue. And so if I am correct, there's one piece of real property and that is 2232 Swift Boulevard, Houston, Texas. That's the only piece of property?

A That's -- that is -- that is one of the assets. And then there's the receivable and the opportunities where it looks for opportunities to lend. It's a lender and it lends money.

Q MCI is a lender?

A But yes, Your Honor, as far as real estate -- yes, as far as -- yes, the Debtor is a lender.

Q MCI is a lender and lends money, but needed a thousand dollars to be paid by an investor in order to pay Subchapter Trustee fees? And needed $400 to pay counsel's travel expenses, but it's an investor? The lender?

A Your Honor, it -- it -- well, the principals of the -- the principal of the Debtor and others were interested in making a DIP loan, but that has not -- that motion has not been filed to

do it, to actually capitalize and fund.

Q Since September 11th?

A There -- there has been some -- some real issues in -- with that. And if you like, I can explain Your Honor, if you'd like to hear it.

Q All right, let me -- so a new petition was filed at Docket 4. And again, it only says that the principal place of business is Swift Boulevard. It shows no other mailing address.

Okay. Let me find a further amended petition. While I'm doing that, why don't you tell me how Mr. Paul Cox came to be the manager of MCITBE.

A Really Ms. Hood and Mr. Yablon and myself, my -- you know, my mom wanted to have a representative or a manager of the Debtor. And I believe Mr. Zimmerer who had done some -- some stuff for my mom in the past said that Mr. Cox would be a good candidate to be a representative of the company.

Q Okay.

A And, you know, that that was I think a good part of it.

Q And so is there any other connection to Dallas other than MCITBE once thought about having some opportunities involving Dallas?

A No, Your Honor. MCITBE has -- there were other past transactions, but nothing current.

Q Okay. I ask because one or one or more of the four

petitions, I think that might be a record for me. One or more of the petitions indicates, and I'll read it to you, "The Debtor has had its domicile, principal place of business or principal assets in this district for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other district."

MR. YABLON: Your Honor, if I may, there's a legal conclusion. I can answer your questions very quickly about the reason for why the Northern District is -- we're in the Northern District for more than 180 days.

THE COURT: Mr. Yablon, after having read the 341, you have a tendency to interrupt and attempt to be helpful here. Sir, I'll have some questions for you as well. But right now I am questioning the only Debtor's representative that I have been provided.

MS. KIPPES: Your Honor?

MR. YABLON: Yes, Your Honor.

THE COURT: Yes, Ms. Kippes.

MS. KIPPES: I was just going to note for the record that the first amended petition at Docket 4, the second amended petition at Docket 85, and the third amended petition at Docket 156 all make that representation at Item 11. Those are UST HH, UST TT, and UST UU.

THE COURT: Okay, thank you.

BY THE COURT:

Q And so, Mr. Choudhri?

A Yes, Your Honor.

Q It says, "The Debtor has had its domicile, principal place of business, or principal assets in this district for 180 days, immediately preceding the date of this petition or for a longer part of such 180 days than in any other district."

A Your Honor. I -- that I don't -- I don't want to misspeak or misstate. I don't know. The only thing I can represent, Your Honor, is I recall from memory there were some discussion about some -- Mr. Yablon, some case law or something he felt that -- based on the discussions that he felt that that would be appropriate. I don't --

Q Okay.

A I mean, I can represent to you, Your Honor, does MCITBE have an office or -- you know, in Dallas? No, Your Honor. It absolutely does not. And the real estate, the real property is in Houston.

Q Okay.

A And I -- you know, I -- I -- I just recall something about saying that it's a statewide issue or something. And I don't -- I don't want to misstate anything. I want to give you the best that I understood and --

Q I think you answered my question that you were unaware of any assets or principal place of business of this Debtor in this district in the six months, but there may be a legal

reason why it was chosen. Is that a fair summary?

A I mean, outside of, you know, it doesn't have a physical office in Dallas.

Q Okay.

A There are -- the expectation was that MCITBE has funds from the transaction that would be used in other opportunities through which deals were identified and opportunities were identified in Dallas, but it doesn't have a --

Q So future business could happen in Dallas?

A Well, it looks like MCITBE is a lender and yes, it -- it didn't want to go through the proper process when the -- when the sole member invests in the -- 'cause you know, it didn't wake up with funds, right? It -- it -- it gets lent money or capitalized money from the -- from the member. And that's kind of how it -- and then you have these various LLCs.

So, but to answer your question very directly, I'm not -- I want to -- there is no physical address in Dallas that MCITBE has.

THE COURT: Okay. Just give me a moment.

(Pause)

THE COURT: Ms. Kippes, can you point the Court to the most recently filed Schedule A/B?

MS. KIPPES: The most recent A/B?

THE COURT: Yes.

MS. KIPPES: That would be UST WW.

THE COURT: Thank you.

MS. KIPPES: At Docket Number 160.

THE COURT: Thank you very much.

BY THE COURT:

Q All right. So if you're going to consider MCITBE as a lender, when it filed bankruptcy, it had $41?

A (No audible response).

Q And it had receivables over 90 days old in the amount of $484,000. Who were the receivables, owed by?

A Jetall/Croix Properties.

Q Okay.

A So if -- if -- you know, and I think there's some confusion about the transaction. If Your Honor likes, I can explain that because I think that might've not been --

Q No, I'm just trying to get to the bottom of these Schedules. Okay, and it says that it --

Q So --

A -- owns a single piece of property.

And that's the house at 2232 Swift, correct?

A Through a foreclosure sale.

Q Correct.

A Your Honor, yes. The April -- it was a March or April foreclosure.

Q Just give me a moment.

(Pause)

THE COURT: Is the Debtor up to date on its real property taxes?

MS. VINCENT: Yes, Your Honor.

THE COURT: Okay, thank you.

BY THE COURT:

Q So, Mr. Choudhri, did you fill out the first set of Schedules for the Debtor?

A No, Your Honor.

Q Okay. Well, who gave Mr. Cox the information?

A Mr. Cox and Mr. Yablon and my mom and I --

Q Okay. Well, Schedules are signed by human beings. They're not just signed --

A Of course.

Q -- by lawyers. And I think you just testified that Mr. Cox was not historically with MCITBE. But as part of discussions with Ms. Hood and Mr. Yablon, he was brought -- and you, he was brought on. And so wo provided the information to Mr. Cox for the Schedules, and to Mr. Yablon? Who provided it. Was it you?

A My mom and her attorney would have provided whatever information. I provided -- I provided documents like anything that was asked, like appraisals from before and things --

Q So all of the creditor information, all of the asset information, that's all something that came from your mother and was given to Mr. Cox.

A No, no, Your Honor. No, no, I -- I definitely -- you know, anything that was asked of me, I helped out by providing the information, like the closing --
Q Who do you think gave more help in this process, Mr. Choudhri? You or your mom?
A I mean, we -- I mean, she relies on, you know, counsel and she also relies on me to help her. So I -- as far as more, I don't know how to answer that. Who gave more? I mean, whatever information I have, I provided it. And --
Q Well, I mean, I'm just curious, Mr. Choudhri. You've been in my courtroom a number of times. Your mother has not been in my courtroom a number of times. It's represented to me that she's the sole member and that for whatever reason rather than being member-managed, you all determined to bring Mr. Cox here.
So I think it's just a fair question that up until this hearing, there was a distinct determination to distance you from the Debtor. Okay. There was a distinct determination to do that up until today. And so now my, my question is how involved have you been?
Please just focus on me right now. Thank you.
How involved have you been behind the scenes on behalf of the Debtor?
A So there is separation. I can give you the background of the Debtor, Your Honor. The -- the -- the Debtor was formed, I believe in 2017. And it has always been owned 100 percent by

my mother, Shahnaz Choudhri. And in 2023, I was involved where I convinced her to sell this property along with Security State Bank, because I had a relationship with Security State Bank and they were interested in doing construction financing.

And so MCITBE owned this property in 2023 and sold it to my -- my company, Jetall/Croix that I'm an equal owner and a manager of since it's about a 15-year-old -- maybe 15 years old. We built a lot of homes, high-end homes. And so my mom's company sold the property to Jetall/Croix and did a seller carry. And MCITBE collaterally signed its note and lien to her, and MCITBE then sold the property to Jetall/Croix and then obtained construction financing at the same time under that closing statement and closing package that I did provide. And the property was sold.

There was a one-year loan. It was a one-year loan Security State Bank. I am involved with them because I am the -- I'm a principal of the borrower. And the loan was extended to 2028 with Security State Bank. And then subsequently Your Honor, the loan did come due for MCITBE, my mom's company. I did convince her to wait, that the property is going to be sold, the title issues -- but Mr. Osama Abdullatif and then subsequently Mr. Vargo filed things on the property and the property couldn't be sold.

And so then I did discuss with Security State Bank if they would work with the borrower and they suggested that if they

foreclosed the property, it would wipe out the lis pendens. But the issue there would be, Your Honor, if they did this so, it would according to the title companies that it does not wipe out the --

Q Okay, Mr. Choudhri. I hate to interrupt you, but --

A I was giving you my involvement.

Q I hope --

A I'm --

Q Yeah, I hope you'll understand how that really doesn't answer my question of your involvement versus your mother's in the filing of this bankruptcy. So I'll move on to a new question. So who acts as the accountant for MCITBE?

A It doesn't have an account, Your Honor.

Q Okay. All right.

A I believe it was in the process of trying to hire someone, but it needed to file an application. And I think that application Mr. Yablon completed, but it was not filed. And then subsequently, Ms. Vincent has a number of motions and things that she plans and planned and got involved. And it's I think --

Q And Ms. Vincent represents you in other matters, as I understand it. Correct?

A Ms. Vincent represents companies.

Q Okay.

A I am a manager of some other LLCs, and she does represent

the -- those -- those companies.

Q Okay. Just give me a moment to review my notes.

(Pause)

THE COURT: All right. I think that that is my questions. Does anyone else have any questions of Mr. Choudhri?

Ms. Kippes, any questions?

MS. KIPPES: Yes, Your Honor, a couple.

THE COURT: Okay.

CROSS-EXAMINATION

BY MS. KIPPES:

Q Good afternoon, Mr. Choudhri.

A Good afternoon.

Q You just said that Ms. Vincent doesn't represent you individually. Is that correct? Did I understand that correctly?

A She presently, no.

Q Okay.

A But I have sought advice from her. Yes.

MS. KIPPES: Your Honor, I'll direct the Court to UST ZZZ. It's a docket sheet from Adversary Proceeding 26-3644 in the Southern District of Texas. And it's a removed action, Mokaram-Latif v. -- et al., Mokaram-Latif, et al. v. Ali Choudhri, et al. And Ms. Vincent is listed as Mr. Choudhri's counsel.

THE COURT: Okay.

MS. KIPPES: Also, UST Quadruple --

THE WITNESS: I'm sorry, what case is that?

THE COURT: That is Case Number 26-3644. I'm quoting to you from UST Exhibit ZZZ.

MS. KIPPES: And Your Honor, AAAA is another removed adversary proceeding in Houston, Case Number 26-3645. It's Mokaram, et al. v. Ali Choudhri, et al. And Ms. Vincent is listed as his personal counsel there, as well.

THE COURT: Okay.

MS. KIPPES: And finally, Your Honor, UST BBBB is another removed action, 26-3650, again in the Southern District. And that is Plaintiff Arabella PH 3201 LLC represented by Courtney Ann Vincent, and co-plaintiff is Ali Choudhri also represented by Ms. Vincent.

THE COURT: Okay, thank you.

MS. KIPPES: No further questions, Your Honor.

THE COURT: All right. Thank you.

Anyone else wish to cross-examine Mr. Choudhri?

MS. HOOD: Judge, this is Lori Hood. I have just a few questions for Mr. Choudhri.

THE COURT: And Ms. Hood, did you file anything in connection with the motion?

MS. HOOD: No, Your Honor, I didn't.

THE COURT: All right. Well, I think I've granted

incredible latitude in this case for folks to question. But I think at this point, given it's the United States Trustee's motion, I think I'm going to pull people to their paces today, especially given the hour.

So with that, anyone else that has filed something that wishes to cross-examine Mr. Choudhri?

(No audible response)

THE COURT: All right. Redirect?

MS. VINCENT: Yes, Your Honor. Actually, Attorney Hood did join the exhibit and the exhibit and witness list when it was filed. So I don't know if that gives her the authority to be able to ask questions, but I do want to point that out.

THE COURT: Not if she didn't file a response.

MS. VINCENT: Understood.

THE COURT: Okay. Thank you.

MS. VINCENT: Thank you for the clarity.

THE COURT: All right. Any redirect, Ms. Vincent?

MS. VINCENT: No, Your Honor.

THE COURT: Okay. Thank you very much.

(Testimony of Ali Choudhri concluded at 4:08 p.m.)

(Court's Ruling began at 5:22 p.m.)

THE COURT: All right. Again, it's like I said, we ran a little long. I would have probably preferred to have an opportunity to put something cogent together. But I think that what is important in this case is there flatly seem to be a lot

of people in this case that are probably not getting paid to be here. And I think I want to cut that off. There's a lot of money that's being spent on a case that I believe is hopelessly bound for dismissal in one way or the other. And I believe that that's why, like I said, I'm going to proceed today on Docket ECF Number 113.

I am going to grant the United States Trustee's motion to dismiss. What we have in this case has been disturbing to the Court from the get-go, from the infancy of this case to today. I'm not sure if anything was ever done timely. And I can guarantee you that even if it was done timely, it wasn't done properly. And I understand that the Debtor may wish to lay some of that at the feet of counsel. And certainly, there have been some failings of counsel in this case. And I recognize that Ms. Vincent is attempting to come in at the eleventh hour and snatch a victory from the jaws of defeat. But it is just not possible at this point. We are too far gone.

And what I would add to that is that in addition, notwithstanding Ms. Vincent's yeoman efforts to bring this case into compliance, we have counsel in Ms. Vincent that frankly is representative of some of the bigger problems the Court sees in the case, which is conflicts.

Conflicts abound.

I am going to address the greater part of the

Trustee's motion, which I believe are all independent grounds for dismissal. But what I cannot ignore is factually what has taken place in this case. Candidly, I will not mince words. I have been told for months and months and months that Mr. Choudhri is not the man behind the curtain, that this case is not being run by Ms. Choudhri as the member, but rather being run by Mr. Cox as the manager. That myth was dispelled today.

Having read the 341 transcript or major excerpts from it, having now reviewed Mr. Yablon's new declaration that is indicating mystery payments coming from yet a new individual in Mr. Zimmerer, and having friends paying various expenses along the way, just the sheer amount of unpaid fees from an administrative perspective in this case, I believe that the conflicts are pervasive.

I believe that in this particular case, I think that Ms. Kippes has used the term prosecuted by committee. I'm not sure that this is being a committee at all. I think this case is being prosecuted by Mr. Choudhri, and I will say that plainly. I'm not ruling in any way factually of whether or not Mr. Vargo as the Receiver has any rights per se to take action against any of Mr. Choudhri's various, let's just say touches to this case, whether it is as a creditor or as a director of the Debtor.

But what I can tell you is that having done a fair

amount of bankruptcy work in my day prior to taking the bench, I don't think that I was ever in a meeting with a client relative to a filing or definitely relative to the preparation of schedules and in that meeting was a member, a director, a brand new manager, and his buddy, Mr. Zimmerer. Not only is there absolutely no attorney-client privilege during that meeting. I mean, it's beyond the pale, frankly.

As I reviewed Ms. Vincent's amended application to employ, I don't think she is employable given the conflicts that are present in this case. Again, I was told for a good four months that the Debtor is not Mr. Choudhri. No, it is Mr. Cox. It is Ms. Choudhri. Ms. Choudhri has never appeared in this Court. I've never had her come as a witness once. Mr. Cox has been used sparingly as a witness and usually only upon declaration.

But today, today is the day I think that essentially -- I mean, frankly, the wizard came out from behind the curtain. At the end of the day, this is a process that is led and is orchestrated by Mr. Choudhri. Now, I'm not saying that that is necessarily an improper thing. But the parties certainly tried to convince the Court of the opposite for four months. And maybe that is because of the issues going on in the other districts in this state relative to the receivership.

But perhaps, just perhaps, the Debtor shouldn't have spent so much time and Mr. Choudhri shouldn't have spent so

much time trying to distance himself from the Debtor only to appear today to be the Debtor's representative, only for the Court to read today in the 341 meeting transcript, which the Court honestly had not read prior to today, that Mr. Choudhri is more than just a little bit involved.

And so with that, what I'll do is I'll begin with the standard. And what I'll cite to you is, just for sake of brevity, I'm going to read to you from a portion of my opinion in the John Wayne Petros matter, which is Case Number 23-32905. This is an order of mine that was entered on November 4th, 2024. And in that case, the Court noted that Section 1112 contains a non-exclusive list what constitutes cause for purposes of dismissal.

But the Fifth Circuit Court of Appeals has held that the term "cause" affords flexibility to bankruptcy courts and can include a finding that the debtor's filing for relief is not in good faith.

Citing to you there from the NRA case 628 B.R. 262, which was citing the Fifth Circuit decision in Little Creek, 779 F.2d 1068.

"The Fifth Circuit has provided the following guidance with regard to the good faith standard required in a bankruptcy proceeding. Every bankruptcy statute since 1898 has incorporated literally or by judicial interpretation a standard of

good faith for the commencement, prosecution, and confirmation of bankruptcy proceedings.

"Such a standard furthers the balancing process between the interest of debtors and creditors, which characterizes so many provisions of the bankruptcy laws and is necessary to legitimize the delay and costs imposed upon parties to a bankruptcy.

"A requirement of good faith prevents abuse of the bankruptcy process by debtors whose overriding motive is to delay creditors without benefiting them in any way or to achieve reprehensible purposes.

"Moreover, a good-faith standard protects the judicial integrity of the bankruptcy courts by rendering their most powerful equitable weapons, i.e., avoidance of liens, discharge of debts, marshaling and the turnover of assets available only to those Debtors with clean hands."

Citing to you there from Little Creek.

"Courts have held that a Chapter 11 petition is not filed in good faith unless it serves a valid bankruptcy purpose." Citing to you there again from the NRA decision.

The movant bears the initial burden of making a prima facie showing of a lack of good faith in the Debtor's filing after which the burden shifts to the Debtor to demonstrate good faith.

In this case, the Court would further cite to you from the Petros decision that, "Debtors in bankruptcy have an absolute duty to report the existence of assets in a bankruptcy case, and goes on to discuss specifically with respect to schedules the debtor's burdens under Section 521 of the Bankruptcy Code, which require a debtor to file a schedule of assets and liabilities, their current income and expenditures, and a statement of financial affairs."

In this case, each of those Schedules were filed late, and so at some point were therefore incomplete. The debtors also have an absolute duty to ensure that their schedules and their statement of financial affairs are complete and accurate. That's from the Unruh v. Tow case (5th Cir. January 27, 2006).

Individually, any one answer may have been the result of an innocent mistake. However, the cumulative effect of all of a Debtor's falsehoods together evidences a pattern of reckless and cavalier disregard for the truth. Citing to you there from In re Mitchell (5th Cir. 2004). That's 102 F. App'x. 860.

Here, the Debtor's Schedules were filed repeatedly with, at best, incomplete information, and they were filed tardily. Over the course of this bankruptcy case, just like in the Petros case, the Debtor materially amended numerous documents time and time again, both petitions and schedules

numerous times, up to four times in, I think in this case, a four-month period.

The representatives before this Court, both lawyers and witnesses have taken extremely varying positions as to the nature of Mr. Choudhri's participation in the case. The Court, frankly, believes that a number of the positions and a number of the changing parties in this case has been for the purposes of delay, frankly. Just to live another day, to put off a hearing on the lift of stay, to take a hearing and stretch it out, which I think frankly is abusive of the bankruptcy process.

What the Court cited in the Petros case is really kind of a printed version of a speech that I have given a number of times in this Court, which is that the Bankruptcy Code functions as a sword and a shield to provide individuals and entities in financial distress with the breathing room to reorganize their affairs and gain a fresh start, while simultaneously protecting the rights of individuals and entities whose assets and affairs are intertwined with that of the Debtors.

In exchange for the considerable benefits bestowed upon Debtors who choose to invoke the bankruptcy process, there are burdens that each Debtor must undertake. Chief among them are honesty and public disclosure. The integrity of the bankruptcy process rests upon the careful balance of these

benefits and burdens, without which the rights of both debtors and creditors would be imperiled.

Indeed, without proper disclosure, the informed negotiations that are a centerpiece of the bankruptcy process cannot realistically take place. And it is for this reason that the Debtor bears fiduciary duties to both its estates and its creditors.

In addition to the benefits and burdens of a bankruptcy, the Court would note that not only is disclosure important, but timely disclosure is important. Again, I will grant you that the Debtor has made a last-ditch Hail Mary to come in and try to conform and file everything that was either deficient, for example, a plan with no signature. There are four iterations of petitions, petitions with no resolutions, many, many versions of Schedules. But at some point it's all just a little too much.

And again, I believe that the constant filings and the constant updates to filings are indicative of bad faith and indicative of abuse of process. Again, the Court was frankly quite taken aback by the fact that Mr. Choudhri was brought as the Debtor's witness today.

I would have expected Mr. Cox. I would have especially expected Mr. Cox after his 341 testimony being part of the record. And if not, I would have expected Ms. Shahnaz Choudhri. Why? Because I've been being told for four straight

months that these are the Debtor's representatives and that Mr. Choudhri's role is as a creditor. And of course, that morphed a little into, but he is a director and now he has an indemnity claim.

Again, I frankly believe without a shadow of a doubt that Mr. Choudhri is the man behind the curtain. I believe without a shadow of a doubt that the person that's actually working with all of these counsel is Mr. Choudhri. And I believe that because if there's anything that we know, we don't know the number between 1 and 200, but we do know that, that Mr. Choudhri is very, very experienced in bankruptcy.

And so there's a case that I cite in the Petros decision called Sal Caruso Cheese, hilarious case name. But in any event, in that case, a Chapter 11 debtor was found to have committed what was called a parade of episodes between the debtor, its insiders, and counsel that were carried out in what the court in the Northern District of New York said to be in direct violation of the Code.

Like here, the Sal Caruso court noted that the petition and schedules evidenced a host of, at best, inconsistencies that when added to the negative responses in the SOFA cast doubt on all of the debtor's disclosures and severely compromise its ability to act with integrity within the context of a Chapter 11. And likewise, the court noted that there seemed to be a record of simple disregard for the

strictures of the Bankruptcy Code or, at best, a calculated strategy of selective noncompliance. And then what I'd add to that, here, is delayed compliance.

And what the court stated in again, in Sal Caruso is that, "The court does not believe that a debtor should be coddled into complying with the Code and then congratulated upon each instance of substantial compliance. The debtor's role as a fiduciary is a self-executing one."

In that case, they converted the case to a Chapter 7. I don't believe that conversion to a Chapter 7 in this particular instance would be in the benefit of creditors and the benefit of this particular estate. I believe that based upon the failures that have been laid bare by the United States Trustee today, specifically failure to prosecute the case in good faith without undue delay, failure to notice a Section 341 meeting twice, failure to appear at a Section 341 meeting twice, failure to a timely file, a plethora of employment applications, including after being given follow-up deadlines by the UST, follow-up deadlines by the Court.

Even today, there was a deadline of October 9th to file a motion to withdraw. Instead of a motion to withdraw, I got more pleadings that indicated to me that Mr. Yablon was in fact staying on. And then what do I get in the middle of the hearing today but a motion to withdraw. That's just simply -- that simply won't do. I've got a Debtor who failed to timely

file its balance sheet, its statement of operations, and its cashflow statements.

Now, what the Court would say to that is I recognize that many of those things didn't exist. And it was a single piece of paper that would say these don't exist that could have been filed, but yet somehow that took over a month. Failure to file timely operating reports, failure to timely pay the Subchapter V Trustee, and then failure to timely file or at all numerous documents that were ordered by the Court in various bench rulings. And likewise, there were the failures to show up for a few hearings, as well. I could scour the docket for that information, but I don't think that it's critical.

I believe that the United States Trustee is correct. That the lack of good faith in prosecuting this case constitutes calls for dismissal. Ms. Kippes cites the Court to Humble Place Joint Venture, 936 F.2d 814. And I think that in this case, there is both a lack of good faith and then there is also, frankly, a futility. At the end of the day, this Debtor has no way of paying the various counsel that have appeared on the record. Apparently, the only payments to counsel have come from a friend of a friend. There seems to be an attempted waiver of a hundred thousand dollars of fees in Mr. Yablon's amended application. There are no operations. And again, there's not a way to do even the most basic funding of a case.

I used to tell my clients when I was still a debtor's

lawyer, you got to pay the freight. I recently read a Fifth Circuit decision from a few years ago that says business is business and bankruptcy is brutal. And it is in that regard. It's an expensive process, and this case can't afford it.

The parade of new counsel, the parade of Debtor's representatives just gives the Court absolutely no faith that this case can (A) be prosecuted in accordance with the strictures of the Bankruptcy Code or, (B) is being prosecuted within the strictures of the Bankruptcy Code such that this Debtor MCITBE should be entitled to the vast benefits that are given to good-faith bankruptcy debtors every day.

And so for those reasons that are set forth in Ms. Kippes' motion to dismiss, in accordance with 1112(b)(4), the Court will invoke Sections E, F, G, and H in dismissing this particular case. Likewise, the Court is going to dismiss the case with prejudice for 180 days.

MS. VINCENT: Your Honor, if I may? Would you reconsider without prejudice?

THE COURT: I did consider without prejudice. It was certainly part of the Court's calculus. But the answer is no.

And, again, Ms. Vincent, I appreciate you swooping in to try to save this one. I'm trying not to cast aspersions here. I just believe that I don't see any process by which there's a likelihood of reorganization for this case. And because of that and because of the way that I believe that the

Bankruptcy Code was frankly abused in this case and the way this case was prosecuted, I am going to dismiss it with prejudice for 180 days.

MS. VINCENT: Yes, Your Honor.

THE COURT: All right, any questions?

MS. KIPPES: Your Honor, I'll prepare an order. I'll run it by Ms. Vincent. I'm going to do a simple order that says for the reasons stated on the record.

THE COURT: Fair enough.

MS. KIPPES: Thank you.

THE COURT: Thank you. Thank you very much.

MS. VINCENT: Thank you.

THE COURT: All right, any other questions, ladies and gentlemen?

(No audible response)

THE COURT: So with that, the Court will stand adjourned for the day. You guys have a great day.

THE CLERK: All rise.

(The proceeding was adjourned at 5:46 p.m.)

* * * * *

CERTIFICATE

I, DIPTI PATEL, court approved transcriber, do hereby certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and transcribed to the best of my ability.

___________________________

DIPTI PATEL, AAERT CET-997

Expires: December 6, 2026

Liberty Transcripts Date: October 26, 2026